The first case for argument is 25-1146 Western, Arkansas, Fayetteville Public Library et al. v. Todd Murray et al. All right, Ms. Patterson, we'll hear from you first. Good morning, Chief Judge Colleton, and may it please the Court. The District Court concluded that two provisions in Act 372, the policy provision and the obscenity provision, violate the First Amendment and the Due Process Clause. This conclusion was wrong, and its judgment should be reversed. For starters, the District Court never should have even reached the merits of the policy provision, because no party has standing to challenge that provision. Library plaintiffs allege harm based on their fears that the policy provision will increase their administrative burdens. But because library plaintiffs are political subdivisions of the state, they lack First Amendment or Due Process rights that they can invoke to challenge a state law. And this is clear in the Supreme Court's cases Williams v. Mayor of Baltimore, Uzura v. Pocatello Education Association, as well as several circuit opinions such as City of Hugo v. Nichols. Regardless, even ignoring this political subdivision problem, their alleged harms are too speculative to constitute an Article III injury. They cannot show that the policy provision will lead to an increase in challenges. And the same is true of other plaintiffs. Their alleged harm is too speculative. They've offered no evidence that a person would challenge the material under the policy provision, much less material that they wish to read, and that the library would relocate or remove that material in response to that challenge. As this Court's opinion in L.H. v. Independent School District demonstrates, this sort of speculative future injury premised on a hypothetical future challenge is insufficient for Article III standing. And even if they could show a non-speculative concrete injury that is sufficient for Article III standing purposes, they still cannot show traceability or redressability. That is because prosecutor defendants do not implement the policy provision public library officials and local governing bodies do. So their alleged harm is not traceable to the prosecutor defendants, nor redressable by a judgment against them. And the alleged harm is also not traceable to the Crawford County defendants' enforcement of the policy provision. Their alleged harm relates to an earlier county policy that existed and predated the policy provision, not the policy provision. And in another case, there is an injunction in place that prevents Crawford County defendants from reinstating the social section. For these reasons, they don't have standing to challenge the policy provision. Did the district court seem to think that it was a virtual certainty that the county would proceed in light of the history? Is that the theory of standing? Yes, Your Honor. He seemed to assume that there would be a challenge. However, at Act 257, one of the partains testified that she was unaware of someone who would challenge the provision in Crawford. So it was still speculation based on that past practice. And it ignores the fact that there is an injunction in place that would preclude the Crawford County defendants from creating that same sort of social section, Your Honor. Whose testimony were you saying? That was Madeline Partain's testimony. Who's Madeline Partain? She is one of the individuals who resides in Crawford County, Your Honor. And she admitted that she was just assuming someone would challenge the provision, and that's at Act 257. But regardless, even if there is standing, their challenge fails on the merits as well. Are you talking about Section 1 there? Section 5, Your Honor, the policy provision. I would like to ask about Section 1. I'm having trouble understanding why the librarians and bookstores don't have standing to challenge Section 1. Yes, Your Honor. Your brief seems to almost concede that point. We take the position that no plaintiffs have standing because they, and this is clear under the court's opinion in Christian Action League of Minnesota v. Freeman, when the obscenity provision is properly interpreted, it doesn't affect the books in their collection. They have not identified books that would fall within that provision to give them standing. But admittedly, it is a close question as to those plaintiffs, which is why we don't spend too much time discussing those plaintiffs in the brief and focus more on the other plaintiffs' lack of standing as to the obscenity provision, because it's admittedly a close call given standing is relaxed in the First Amendment context. So we try to just point the court to those portions of the record, showing that those plaintiffs' allegations we still think are too speculative because they don't provide the detail about the books. No evidence regarding the books is in the record. They don't introduce the books into the record or provide descriptions of the books or anything of that nature. And their testimony even states that they don't believe the books in their collection would fall within the obscenity provision's definition. Turning back to the policy provision. On that policy provision, you say there's an injunction in place to prevent the county from segregating books. I understand the injunction you're referring to is the one entered by Judge Holmes. Is that right? Yes, Your Honor. But does that injunction forbid the county from acting pursuant to Section 5? So pursuant to Section 5, the county is not allowed to discriminate based solely on viewpoint. So they would not be able to make those decisions for the same reasons. They would still be able to, in response to a challenge, if they review that material, review it in accordance with their selection criteria and assess whether they think it meets the selection criteria or not, and take action in response to that. But they would not be able to create a viewpoint discriminatory social section as they were alleged to have done in that case, Your Honor. But regardless, even if they do have standing, that provision fails on the merits. The policy provision simply imposes minimum requirements on public libraries, including that they have a written curation policy that they make public. Many of these libraries already had curation policies, it just requires that it be written and made public. And that they have a challenge process that complies with certain minimum procedural requirements. Again, many of these libraries already had challenge provisions, it just is requiring that they comply with certain procedural requirements. Because the policy provision regulates public libraries' curation decisions, it regulates government speech, which means it does not violate the Free Exercise Clause. The curation decisions satisfy every indicia of government speech, as a plurality of the Fifth Circuit recognized in Little v. Lono County. But even if public library curation decisions are not government speech, the policy provision still does not violate the First Amendment. For several reasons. First of all, the public libraries were already making content-based discriminations. That's in the nature of what they do. Deciding what books would be edifying or beneficial for the communities and serve their interests and which would not. All the policy provision does is impose minimal procedural requirements on how it is making those decisions to increase transparency and accountability. Second, even assuming plaintiffs had introduced evidence that a book would be challenged, a book that they wanted to read, and that that challenge would result in the library removing or relocating the book, they still have not proven a First Amendment violation. And that is because there is no First Amendment right to compel the government to provide plaintiffs' preferred books at taxpayer expense or to shelve them in a particular way. And that is made clear in this Court's cases in Penguin Random House v. Robbins, that the First Amendment does not guarantee the right to access books of one's own choosing at taxpayer expense, as well as this Court's opinion in Walls v. Sanders, that the right to receive information cannot be used to require the government to provide a message with which it is no longer willing to say. As well as Supreme Court cases, including Reagan v. Taxation with Representation. It therefore does not violate the First Amendment. The policy provision also does not violate the Due Process Clause. It does provide guidance to the library and local governing bodies to assess whether material is appropriate and in accordance with the selection criteria. And perfect clarity and precise guidance has never been... Do you mean that appropriateness is the equivalent of consistency with the selection criteria? Or are they two different factors? In assessing appropriateness under Section 13-2-106C7A, the library officials are supposed to assess whether it complies with the selection criteria. And the selection criteria talks about materials being age appropriate and things of that nature. So we think appropriate is to be interpreted in light of whether it complies with the library selection criteria. Does that mean it's the equivalent of inquiring whether the material complies with the selection criteria? Or does it go beyond that? We think it is tethered and tied to the selection criteria, Your Honor. So does that mean the two are equivalent? Yes, Your Honor. And regardless, even if appropriateness had a broader definition, it still does provide some guidance. Perfect clarity and precise guidance have never been required, even in the First Amendment context and even when criminal or civil penalties are involved. And that's not the case here for the policy provision. There are no criminal or civil penalties. As the Supreme Court recognized in National Endowment of the Arts v. Finley, that in this sort of context, even quote, undeniably opaque end quote terms aren't forbidden. Here, the consequences of imprecision are not constitutionally severe in this sort of context when the government is acting more in the role of patron. And you see that at page 589. On this question of appropriateness, does the record show any selection criteria that are in place? So the district court enjoined enforcement of the policy provision before it went into effect. However, as I mentioned earlier, libraries frequently already had selection criteria in place and some of the library's previous policies are in the record at RDoC 93-2 and RDoC 93-3. Are all of those policy provisions consistent with the statutory scheme as enacted? Or will they all have to be redrafted? Because when I was reading it, it looked to me like there was a direction that they revise and review and adopt the policy consistent. So when it comes to the selection criteria, I don't recall seeing anything that would need to be changed in light of the policy provision. However, I believe possibly some aspects of it related to the challenge procedure would need to change, Your Honor. Okay, thank you. Turning to the obscenity provision, plaintiff's challenge to that provision fails too. Even assuming they have standing, it's not overbroad or unconstitutionally vague. The obscenity provision prohibits a person knowing the character of the item involved to knowingly furnish to a minor an item that is harmful to minors. Counsel, do we have to apply the definition from Shipley when we're looking at what's harmful to minors? It needs to be interpreted consistently with the Shipley opinion. Because under Arkansas case law, the Arkansas Supreme Court does interpret provisions consistently with other provisions. But the plaintiffs misinterpret the Shipley decision, Your Honor. They focus on the court's discussion of the dissimilar provision, which was later held to be unconstitutional, rather than the discussion of a similar provision that was later held to be constitutional. So the dissimilar provision prohibited the display of material which is harmful to minors in such a way that minors, as a part of the invited general public, will be exposed to view such material. And it had a safe harbor provision that if a person had two-thirds of the material covered, not exposed to view, or had physically segregated that material, that they would not be held liable. And the Arkansas Supreme Court reasoned that in light of this safe harbor provision, requiring physical segregation, and in light of this invited general public language, that there that provision would be violated simply by shelving a book, and that whether material was harmful to minors had to be determined based on a younger minor. However, when it interpreted a provision that's more similar to what we have here, that made it unlawful to knowingly sell, furnish, distribute, allow to view, or otherwise disseminate to a minor any material which is harmful to minors, it reached an opposite conclusion. Despite the prohibition on allowing a minor to view harmful material, in light of the other verbs in that list, and the scienter requirement, the court reasoned that to violate that provision, a person needed to take an affirmative action to actively permit a minor to view the harmful materials, and that simply shelving it would not be enough. At the very least, it would have to be deliberately turning a blind eye to that activity, and it was targeted to a specific minor, meaning assessed whether it was obscene as to that particular minor, not minors as a class. The concurrence also helps explain this point, talking about when selling a book to a 10-year-old, for example, the question is whether it be harmful as to that 10-year-old, not to minors as a whole. Regardless, even if minors had to be considered as a class, as the U.S. Supreme Court recently explained, in Free Speech Coalition v. Paxton, it likely would need to be viewed from the perspective of an adolescent minor, because it's not really, and they say this in footnote 7, it's not clear it's coherent to talk about what would have a predominant tendency to appeal to a prurient interest in sex to minors when you're talking about a younger child. And that's one thing that plaintiffs overlook here, is the obscenity provision only prohibits material that is obscene to minors, so it has a lawful, and it has that three-pronged definition, and that has been upheld by the Supreme Court and several circuit courts as well. So it has a wholly lawful scope and is narrowly tailored, because minors have no First Amendment right to access material that is obscene to them. But as Free Speech Coalition v. Paxton makes clear, it's only subject to intermediate scrutiny, and it easily satisfies that because it is so targeted. And it's far narrower than the law at issue in cases on which plaintiffs rely, because they're citing to a lot of cases that ban speech to adults as well, or ban protected speech to minors, such as definitions that were broader than this narrow obscenity provision, or things like protected speech, such as violent video games. Unless the Court has further questions, I'd like to save the remainder of my time for rebuttal. Very well. Thank you.  Excuse me. Mr. Adams, we'll hear from you. Good morning, Your Honors, and may it please the Court. This case is about whether the state of Arkansas can threaten librarians and booksellers and even parents with jail for merely making available a book that is harmful to minors. It's also about whether Crawford County can implement the state's policy of listening only to those that deem a book inappropriate and not those who would like a book to remain on the shelves of their local public library. I want to respond to a lot of what the state got into and field your questions. Starting, I think, quickly with... You might adjust the microphone so we can see. Thank you, Your Honor. The podium can be adjusted as well. There's a button on the right side if you want to raise it. Thank you, sir. Thank you. The state's arguments about the scope of Section 1 don't give full credence to what Judge Isley did 20 years before Act 372 in the Shipley case. It is good that the state points out that there were two sections at issue back then. There was a display provision and a sale provision, and it included sale and lending. It essentially covers both our librarian and bookseller clients. That case, in fact, relied on a very common sense distinction between putting a book on a shelf and not excluding minors from the facility. And a one-on-one, what the state describes as targeting with obscenity transaction, when a librarian or a bookseller puts a book in the hand of a minor that is unsuitable for that minor. These are very different things. And the display provision in the original statute covered up a broad range of action and for that reason was held unconstitutional. The kind of age discrimination in the positive sense that a librarian could do from the Shipley dissent at the Arkansas Supreme Court that the state is relying on from back in 2004 is only possible with the second kind of prohibition on sale or lending. When you are talking about displaying a material, or in the case of the new act, merely making it available by putting it on a shelf, there is no way, besides excluding all minors, to know whether it is an 11-year-old minor, in the case of the youngest library patron that is allowed to be there unsupervised, or a 17-year-old patron that is pulling that book down off the shelf. So the entire concept of making a truly variable determination about whether an item is suitable for a minor only makes sense in the context of that second kind of prohibition on sale. Are you saying that the state has no ability to protect 6-year-olds from obscene materials because something might be suitable for a 17-year-old? No, I think the state has clearly a compelling interest in protecting a 6-year-old and lots of constitutionally permissible statutes that might go about doing that. In fact, all of the examples of the plainly legitimate sweep that the state wants to cite as justifying this new statute were already banned under the prior statute, as she said, the sale provision that was upheld. Any time a person wants to put a book in the hands of a 6-year-old that is sexually explicit for that 6-year-old, that has been illegal in Arkansas for over 20 years and Act 372 didn't add or remove from that. Did the district court even conduct a proper over-breath analysis? I don't see anything in the order where they identified all the applications of the law in order to determine whether the unconstitutional applications were way more than the constitutional applications. I don't even see that analysis in the order. I take your question, but I don't think this order has a net choice problem for the following reason. The district court found that all of what Act 372 added to what was already illegal in Arkansas was an over-broad statement. So to the extent that what Act 372 was trying to do was go back and re-litigate Shipley by essentially saying Arkansas is not banning just giving a minor something that's unsuitable for that minor in a one-to-one transaction, but making merely shelving it, displaying it, making it available, I think is even broader than displaying because it doesn't have any kind of restriction on what's within the book. It doesn't have any restriction on applying it to only what's on the outside of the book or what's visible. It includes the interior contents of the book. So it's quite a bit broader. So I think the judge was well within his rights under the net choice framework to find that everything added by Act 372, Section 1, was an unconstitutional addition to the prior Arkansas harmful to minors statute. The other thing I think the state... What about the over-breadth analysis? How would you describe the over-breadth problem here? For Section 1 or Section 5? Section 1. Well, I think it was easy for the district court in that sense because all of the plain and legitimate sweep, the denominator, so to speak, falls away because it was already illegal. The state wants to essentially gain that proportionality. You're saying there's no part of 372 that added anything permissible in your view? That's how the district court talked about it, and that's what I think happened. And I think if you study the verbs, as the state points out, and compare the verbs in the 2003 statute to the verbs in the 2023 statute, essentially what happened was the more passive verbs like display and make available and the more active verbs like send, show, lend, sell were run together. And the state wants the benefit of the deference given to the targeting one-on-one transactions for what get analyzed in all the prior cases in a very different way because of the burden on plainly constitutional distribution of material, both to older minors and adults. When a bookstore has to worry about an 11-year-old finding Lady Chatterley's Lover on the shelf, that's a book that many of us are going to find unsuitable for minors. That brings up another problem. The state likes to say this is not a problem because any book with scientific literary value is going to have that value for minors. But that totally understands how the third prong of Miller-Ginzburg came about. It came about because judges were looking at books like Lady Chatterley's Lover and saying, well, this has descriptions of sex, which don't make some of us blush, but it also talks about class and gender relations in a way that has import, legitimate literary import to lots of grown-ups. Just because that book has value to a grown-up doesn't mean it's going to have value to an 11-year-old that might be capable of reading the words. So the scope of these harmful-to-minors statutes has always been understood by judges to be necessarily variable in a way that precludes sloppy application with passive verbs. And also to just cover a lot more material than what's Miller test obscene. The state calls this the obscenity provision, and obviously it is variable obscenity. But nobody that looks at this doesn't think that there's a lot of material that my 9- or 12-year-old daughter is not quite ready to read yet. So with the court's permission, I'd like to turn to Section 5, because I think there may be lots of questions about that as well. I want to make sure I can answer them to the best of my ability. I'd like to have you explain how that section harmed your clients. It seems rather speculative to me. We didn't have the benefit of the LH decision when we started this case and the library plaintiffs came to us. But we did have the benefit of a general understanding of how federal judges think about Article III and prudential standing. So we challenged the plaintiffs to say, these judges might want to know who it is you think is going to challenge the books, what books they're going to challenge, what process they're going to go through at the library. They answered all my questions quite explicitly. If you look at the record, it's simply not true that they don't know who's going to challenge. The fact that the mature minor couldn't identify the likely challengers doesn't mean that much. The grown-ups knew. There was an identified group of people that, if you read the Verden decision, are quite plainly identified. And everybody in Crawford County knew who they were. The two adult Crawford counties knew who they were. They had a list of books, 20 books, that they wanted taken out, including Uncle Bobby's Wedding, which I can come back to in a minute because it's in the federal reports. So you guys can go look at it yourselves if you'd like to, Your Honors. They had a process those challengers went through which was strikingly similar to what Section V would set up. First, they went to the librarian and said, please take these books out. We think they're inappropriate, using those words. They went to the library board. At that point, that was the governing authority. The library board said, no, we think those books are appropriate or consistent with our criteria of selection. Then they went to the county quorum court. The county quorum court threatened to defund the library and the library backed down. Now, we heard at deposition all of that detail from not just our plaintiffs but from the county judge who admitted that he hadn't reviewed the books. He just understood they were obscene. We put the copy of Uncle Bobby's Wedding in front of him and he said, well, I guess it's not obscene, but I hadn't looked at it. It's important to realize that Section V, again, graphs on to an existing set of practices. It's not just some libraries that have criteria of selection. All of the libraries that we're familiar with, that you can see extensive records of if you read our summary judgment briefs, they all have criteria of selection now. They also all have challenge provisions. The way that works in every library in Arkansas that I'm familiar with is you can file a form. You can describe why you think a book is inconsistent with what the library's stated criteria are. That gets heard by librarians. Then it goes to the library board. Counselor, you're describing a process. How is this injury informed? Because the viewpoint discrimination that the Verden case describes was ongoing at the time Act 372 was passed, was ongoing at the time Act 372 was going to go into effect, was documented by that district court, and it was very specifically going to be ratcheted up in a letter put in the record by the Crawford County's own attorney who said, we're going to keep doing what we were doing, which we perceive to be important to protect minors, and the court found it to be a pretext for viewpoint discrimination. It's going to be ratcheted up even more. We're not just going to take the books out of the adult section. We're going to make them inaccessible to minors and connected the ongoing activity to viewpoint discriminate in Crawford County to the impending and imminent implementation of Act 372. Again, the story that these plaintiffs told me when they came really addressed all the sort of concerns that the court's talking about. In the L.H. case, I think we can concede to the state that in most book challenge cases, this is not going to happen. This was an unusual set of events that made this an imminent event in Crawford County. But Crawford County's judge, its court and its lawyer tied these two things together in a very real way. The other thing I want to talk about is Penguin Random House. Who do you say would be injured by what you say is an impending action by Crawford County? Just as the district court found, the three Crawford County library plaintiffs would be injured if Section 5 went into effect. Libraries as entities? No, the three Crawford County plaintiffs are library patrons. You called them library plaintiffs. Oh, sorry, library plaintiff patrons. I understood, patrons. Those are three people, if you look in the records. Yeah, I understand.  Mielle Partain, her daughter Madeline, and then Lita Kaplinger. Now, the other part of this that I think really is relevant to the state's discussion of Penguin Random House. All of the procedural protections that Section 5 add exist inside the libraries. There is a hearing if somebody complains about a book's existence inside a library. Again, that maps very neatly on to what is happening in Arkansas every time someone challenges a book prior to Act 372 and now with it being enjoined. The primary thing Act 372 adds is essentially a one-way ratchet. You can't complain about a book being taken out. You can only complain about a book being added. You go up the stage from the library staff to a committee of librarians to the quorum court. When you do that final step to the city board or the quorum court, all of what they're talking about falls away. That board had no part in the creation of the library policy, which under Arkansas Constitution is a duty given to the library boards. Local communities set up property tax and that money is dedicated to public libraries, a specific purpose, and to library boards, which again report to the city or county but are not identical to the city or county. So that's what's been going on before. What this does is adds graphs on a new process where the county quorum court or the city board has to receive a complaint about a book. It can't receive a complaint about a book being taken out based on its viewpoint discrimination. It can only receive a complaint that a book needs to be taken out. And it doesn't have to look at the criteria of selection. Again, they weren't involved in the creation of the criteria of selection. We're within 30 days. They don't have to look at the material at all. They don't have to create any kind of record. So the point is Act 372, Section 5 takes what was otherwise a fairly comprehensible due process that people go through to help figure out which books should be in their local public libraries and turns it into a kind of one-way ratchet that gives censorious parts of the local population power that my clients don't have as someone that wanted some of these books in there. All three of them testified that they had and would continue to take part in advocating for the presence of books that they wanted in the library, like Uncle Bobby's Wedding, but would be denied the opportunity to do that because of the way Act 372 is structured. So even if the court disagrees with our primary argument that there is an access to information issue here and follows the Llano County case, at least the three judges in the middle that didn't adopt the government speech argument but also found there was no right to access information there, Section 5 is a really bad test case for that because it's not really geared to generate fair results. It's geared to just give the loudest members of a local population a kind of heckler's veto. Are you saying there's some kind of constitutional right under the First Amendment or Fourteenth Amendment to control the review process of public libraries? I think there are due process constraints. Anytime the government sets up a subsidy for private speech this way, that you can read in cases like Rosenberger v. Rector or Velazquez v. Legal Services Corporation, that means that even though we're admittedly precluded from making public forum arguments about the nature of a book collection, that there is an important First Amendment and due process element to how these challenges go. The state shouldn't essentially codify a heckler's veto to the loudest elements of a local population that forces public officials like Judge Keith in this case to have to respond to claims that a material is obscene when he's not really in a position to make a judgment about whether the material is obscene until we get him into deposition and he finally looks at the book. So you're saying it's not a First Amendment problem, it's a due process problem? Well, it's a process aspect of the First and Fourteenth Amendment rights that people have in certain contexts when the government subsidizes private speech. So you want the First Amendment or the due process clause? Well, it's both, Your Honor, in the sense that I think the First Amendment has process limitations that it places in certain kind of situations, like I mentioned the Rosenberger v. Rector case. So in that case, the University of Virginia didn't have to create that program to subsidize private journals, right? There's nothing in the First Amendment that says they've got to pay the printing costs for student magazines. But once they do that, there are process limitations on the rules they can set up for how students apply. And setting up a vague standard about, well, your journal can't be about ultimate religious things, simply... What if there were no statute and the library just had a process where they decided what books they thought were appropriate for the library and which ones weren't, and that's how they made their collection? Would somebody have a right to challenge the way the library's creating their collection? Not in the absence of some evidence of viewpoint discrimination. So again, I think I would go back to the Wide Awake case and say students at the University of Virginia don't have a freestanding right to complain about the way that the university was handing out printing subsidies. But once the university creates that right, starts subsidizing private speech, there are limits to what lines the government can use to decide what speech to subsidize and which speech not to. And Section 5 is a fairly blatant attempt, as the judge found and I think we saw in Crawford County, to set up an unconstitutional one-way ratchet to have books taken out, and it really flies in the face of any sense that they were trying to curate. Now would that...flies in the face of... Well, let's... Why wouldn't it be curation? Let me just say one quick thing about the government speech argument.  Llano County's lawyer in the Fifth Circuit had a really clear answer when he was asked, who is the government speaker? It was the Llano County chief librarian. The state can't answer that question here. Because Section 5 sets up a weird process where they're saying, the library staff sets up some criteria of selection, which they've already done in every case in Arkansas. Again, they're just describing the standard state of affairs libraries go through. Then something totally different happens. What used to go to the library board, which has the authority under the Arkansas Constitution to spend book money, now goes to a separate body of the government, which doesn't have to consider that criteria of selection. So who's the government speaker? Is it the staff, the library board that used to have the ultimate authority, or the county judge in the quorum court that just got injected into this process in a way that the judge found, I think, reasonably based on what was going on in Crawford County, is a thinly veiled attempt to pull controversial material out of Arkansas public libraries. What's that had to do with the government speech point? It means that... Are you saying there's no speaker? Yes, I'm saying they can't identify the actual speaker. Even if this court were inclined to follow those 7 of 17 judges in the Fifth Circuit and find these to be government speech decisions, Section 5 of Act 372 is a spectacularly bad vehicle to vindicate that principle. Because it's exactly the sort of garbled mess that people worried about when you talked about putting books in a public library, because who's ultimately responsible for the Section 5 process? We sued Judge Keith because he adds the plainly unconstitutional elements to what was going on in Arkansas before Act 372. All right. Thank you for your argument. We'll hear Rebella. I'd like to respond to a few of the things that he said. First of all, towards the end, he talked about the policy provision in public libraries as though there are programs to subsidize private speech, referring to cases involving universities. But that's not the case. Public libraries, if anything, are subsidizing the reading, not the speech. As the Supreme Court said in United States v. American Library Association, a public library does not acquire Internet terminals to create a public forum for web publishers to express themselves any more than it collects books in order to provide a public forum for the authors of books to speak. So that's not what it is doing here. And as explained, plaintiffs don't have a right to compel the government to provide books that they wish to read at taxpayer expense, as this Court's opinion in Penguin Random House v. Robbins makes clear. Now, if it is done in some sort of way with different facts, there might be some sort of equal protection claim or something else there, but there's not a First Amendment problem and there's not a due process problem, which is also clear from the Supreme Court's case in National Endowment for the Arts v. Finley that I discussed earlier. To move back to the beginning of his argument, he began by referencing a parental rights claim. They did not bring a parental rights claim here, nor did they bring an as-applied challenge. They only brought a facial challenge, and they can't point to a single, realistic, not fanciful, unlawful application, much less the lopsided ratio that would be required to prevail. Turning to Shipley, he tries to portray the similar provision as a sale provision, but that's not accurate. It also included the term allowed to view, and yet the court read that term narrowly in light of the other verbs, and the court should do the same here, based not only on Shipley, but also on the Supreme Court's opinion in United States v. Williams, where it looked at a string of operative words and took those to narrow the two words that were challenged and to interpret them more narrowly. Of course, there's also the constitutional avoidance candidate play, as well as Arkansas statutory construction principles that require criminal statutes to be interpreted narrowly. Plaintiffs also continue to ignore the scienter requirement that requires a person can only be prosecuted if they knew the character of the item involved and knowingly furnished it to a minor. And that item also has to be viewed as a whole, meeting that three-prong definition, something they continue to gloss over. At one point, plaintiffs also suggested that the lawful scope is exactly the same as a provision that was already at issue, but that is not accurate. The items covered in this obscenity provision is broader than the materials covered in the other provision. The items are defined in Arkansas Code Section 5-27-212-4A, and it includes things like performances and things of that nature that were not covered by the other provision that they referenced. And there's also different criminal penalties involved, so it is not the same. And again, they still haven't pointed to one unlawful application, much less the lopsided ratio. And that gets back to, it is a rare case where a party can prove a facial challenge and that it is not a case that it should be challenged as applied. And they have failed to carry that burden here. In Holder v. Humanitarian Law Project, the Supreme Court explained that there, the plaintiffs had failed to show that activities described at such a level of generality will constitute prohibited services under the statute and that it would require sheer speculation, which meant that plaintiffs cannot prevail in their pre-enforcement facial challenge. The same is true here. They don't provide descriptions of the books, they don't provide the books themselves, anything of that nature, and they still have not proven a single unlawful application, much less the lopsided ratio that would be required to prevail here. Therefore, all of these reasons and the reasons explained in the brief, we ask the court to reverse, and that judgment should be entered for defendants. If the court has no further questions. Very well. Thank you for your argument. Thank you to both counsel. The case is submitted, and the court will file a decision in due course.